# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

FERNANDO FONTANEZ,

       *Plaintiff*,

    v.

U.S. SOCIAL SECURITY
ADMINISTRATION,

       *Defendant*.

           Civil Action No. 17-2844 (RDM)

---

## <u>MEMORANDUM OPINION AND ORDER</u>

Sometimes, the Social Security Administration ("SSA") pays someone too much money. Receiving a too-large check from the agency is not like drawing the "bank error in your favor" card in Monopoly. Under the Social Security Act ("Act"), the beneficiary must repay the government for any money received beyond what was owed. *See* 42 U.S.C. § 404(a)(1)(A). But the SSA cannot recover overpayments if the beneficiary was not at fault for the error and recovery would defeat the purposes of the Act—for instance, because the beneficiary cannot afford to repay the sums received in error. *Id*. § 404(b). And fair is fair. If the SSA instead pays someone too little, then it must correct the underpayment by sending the beneficiary a larger payment to make up the difference. *Id*. § 404(a)(1)(B).

Plaintiff Fernando Fontanez has received disability benefits from the SSA since 1988. Over the years, he has received both underpayments and overpayments. After a long and complicated administrative process, in 2017 an Administrative Law Judge ("ALJ") issued a "fully favorable" decision in Plaintiff's case. The ALJ determined that Plaintiff had been overpaid tens of thousands of dollars, but the ALJ waived recovery of the overpayments. But, as

far as Plaintiff was concerned, that decision did not go far enough, and he filed an administrative appeal and then filed this lawsuit, alleging that the SSA owes him money. Now pending before the Court are the SSA's motion to dismiss, Dkt. 28, and Plaintiff's motion for judgment of reversal, Dkt. 27.

For the reasons that follow, the Court will **DENY** the SSA's motion to dismiss and will **DENY** without prejudice Plaintiff's motion for judgment of reversal. The Court, acting *sua sponte*, will also **DISMISS** Plaintiff's claims for damages, which the Act does not permit.

## I. BACKGROUND

The following history is drawn from Plaintiff's complaint and from the voluminous administrative record, which the Court must consult to determine whether it has subject-matter jurisdiction. *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Although neither the complaint nor the administrative record is a picture of clarity, the Court has done its best (without any assistance from the SSA, which inexplicably failed to respond to Plaintiff's motion for judgment of reversal) to piece together the events that led to this litigation.

### A.    Statutory and Regulatory Background

Plaintiff began receiving Old-Age, Survivors, and Disability Insurance benefits in March 1988, when the SSA deemed him disabled with a personality disorder. Dkt. 15 at 16. Over the ensuing decades, Plaintiff received both overpayments and underpayments from the SSA. *Id*. at 16–17. That is, during certain periods, the SSA paid Plaintiff more than the amount to which he was legally entitled, and, at other times, it paid him less than he was owed. *Id*.; *see also* 20 C.F.R. § 404.501(a) (defining "overpayment" and "underpayment").

The Social Security Act and its implementing regulations address over- and underpayments.  If the SSA determines that it has paid a beneficiary "more or less than the correct amount," then it must adjust or recover payments to balance the ledger.  42 U.S.C. § 404(a).  In the case of an overpayment, the Act gives the SSA several options for recovering the beneficiary's debt to the government, including by decreasing future benefit payments.  *Id*. § 404(a)(1)(A); *see Califano v. Yamasaki*, 442 U.S. 682, 684–85 (1979) (explaining that the Act "permits the Secretary to recoup . . . erroneous overpayments by decreasing future payments to which the overpaid person is entitled"); *see also* 20 C.F.R. § 422.402(b) (defining "debt").  The agency may not recoup the overpayment, however, if the beneficiary is "without fault" and "adjustment or recovery would defeat the purpose" of the Act or "would be against equity and good conscience."  42 U.S.C. § 404(b)(1); *Califano*, 442 U.S. at 685.  In the case of an underpayment, the SSA is required to "make payment of the balance of the amount due such underpaid person."  42 U.S.C. § 404(a)(1)(B)(i).  If a beneficiary has been both overpaid and underpaid, SSA regulations provide for "netting" the errors to determine whether, on balance, the beneficiary is owed or owes money.  20 CFR § 404.504; *Sullivan v. Everhart*, 494 U.S. 83, 87 (1990).  Pursuant to the netting regulations, a beneficiary cannot recover for underpayments unless the amount of the underpayment exceeds that of any overpayment.  *Sullivan*, 494 U.S. at 87–88.

**B.    Factual and Procedural Background**

With that statutory framework in mind, the Court turns to the convoluted factual and procedural history of the overpayments and underpayments in Plaintiff's case.  From April 1997 to August 1998, Plaintiff continued to receive benefits while gainfully employed, resulting in overpayments, and from July 2000 to February 2001, Plaintiff continued to receive payments

while incarcerated, resulting in additional overpayments.  Dkt. 15 at 19; Dkt. 15-4 at 10; *but see*
Dkt. 15 at 55–56 (listing conflicting dates for Plaintiff's periods of gainful employment and
incarceration).  In 2001, the SSA informed Plaintiff that he had been overpaid $24,911, Dkt. 15-4
at 10, and Plaintiff requested a waiver on May 17, 2001, Dkt. 15 at 43–50.  Plaintiff argued that
he was not at fault because he had notified the SSA of his employment and because he was
unable to repay the debt.  *Id*.  He asked that the agency accept his "sincere apology."  *Id*. at 50.
On July 20, 2001, the SSA denied Plaintiff's waiver request, finding that he was at fault for not
notifying the agency of his employment and incarceration.  *Id*. at 51–57.  On July 21, 2001,
rather than appeal that decision, Plaintiff agreed to repay these overpayments by accepting a $50
per month reduction from his SSA benefit checks.  *Id*. at 58–59; *see also* Dkt. 15-4 at 10.

Several years later, the SSA underpaid Plaintiff.  On December 14, 2004, the SSA
determined that Plaintiff's disability had ceased.  Dkt. 15 at 16.  But the agency later reopened
his case and, on November 30, 2007, an ALJ overturned the December 2004 decision.  Dkt. 15-2
at 64–67.  The ALJ decided that Plaintiff was "entitled to a continuing period of disability" based
on schizophrenia, bipolar disorder, anxiety/PTSD disorder, and polysubstance dependence, "as if
disability had not previously been ceased."  *Id*. at 67; Dkt. 15 at 16.  In a letter dated January 30,
2008, the SSA wrote that it would restart Plaintiff's benefits.  Dkt. 15 at 74–76.  Then, in a letter
dated March 23, 2008, the agency confusingly informed Plaintiff both that he would "soon
receive a check for $25,200.00 because [the SSA] had withheld money from [his] benefits" but
also that the SSA would "withhold money from [his] checks to collect the overpayment of
$25,200.00," with $50 per month being withheld for 504 months.  Dkt. 15-2 at 68.  In a letter
dated the very next day, March 24, 2008, the SSA wrote to Plaintiff clarifying that he had
received payments to his bank account of $20,349.50 and $25,200, "representing all retroactive

benefits due," and that his regular monthly payments going forward would continue to have $50 deducted to recover the previous overpayments. *Id*. at 71; *see also* Dkt. 15-4 at 74 (referencing these two payments totaling $45,549.50 made in January 2008). In the current dispute, Plaintiff repeatedly (and confusingly) refers to these payments as adding up to $48,000, although it is clear from context to which payments he is referring. *See, e.g.*, Dkt. 15-3 at 59 (referencing "the $20,000 + $25,000 = $48,000 payment" and distinguishing it from a separate $40,000 lump sum that Plaintiff claims he never received).

Additional overpayments followed. After awarding Plaintiff retroactive benefits for the period between 2004 and 2007, the SSA later determined that from May 2005 to August 2005, February 2006 to September 2006, and January 2007 to April 2008, Plaintiff had been a fugitive felon, rendering him ineligible for benefits during those periods and thus transforming the lump sums he received as compensation for underpayments into alleged overpayments. Dkt. 15 at 19; *see also* Dkt. 15-4 at 61 (slightly different dates). In addition, from March 2009 to June 2009 and November 2010 to December 2010, Plaintiff was institutionalized in a mental facility but continued to receive payments, resulting in further overpayments. Dkt. 15 at 19; Dkt. 15-3 at 13; Dkt. 15-4 at 80. The SSA sent Plaintiff several notices regarding overpayments, with varying assertions about how much Plaintiff owed. Plaintiff frequently sought waivers of overpayment recovery and filed multiple requests for reconsideration. Plaintiff's various requests for relief and the agency's corresponding denials and notices of how much he owed form a long and tortuous road.

After the SSA assessed Plaintiff with overpayments based on outstanding warrants, Plaintiff filed a request for a waiver on September 8, 2008. Dkt. 15 at 16, 90–97. Before considering that request, the SSA informed Plaintiff on February 25, 2009 that it had overpaid

him $2,780 for the period between August 2008 and January 2009, in addition to an overpayment of $14,649.50 (for which a hearing was pending) and a previous overpayment of $25,150 (toward which he was already paying $50 per month). Dkt. 15-2 at 77. The letter instructed him to repay the money to the SSA within 30 days. *Id*. On March 6, 2009, Plaintiff submitted another request for waiver of recovery of the overpayments. Dkt. 15-1 at 2–9. On March 21, 2009, the SSA wrote to Plaintiff provisionally denying his request for waiver (although the letter did not specify which request it purported to deny) and setting a hearing, known as a personal conference, for April 9, 2009. *Id*. at 22. The administrative record does not indicate whether Plaintiff attended that conference.

The SSA sent Plaintiff another letter on May 6, 2009, informing him that he had been overpaid by $75,743.70. *Id*. at 24. Less than two months later, on July 2, 2009, the SSA informed Plaintiff that he now owed $98,159.30 and that the agency would start withholding his entire monthly payment (through 2013) to recoup the overpayment. *Id*. at 30. On July 14, 2009, Plaintiff filed both a request for reconsideration of the SSA's determination that he owed $98,000, *id*. at 32–33, and another request for waiver, *id*. at 34–41. Shortly thereafter, on August 4, 2009, the SSA told Plaintiff that his balance was down to $96,895.30, perhaps because the agency had withheld a monthly payment and counted it against his debt. *Id*. at 42. In the same August 4, 2009 letter, the SSA concluded that it had no basis for reversing the denial of Plaintiff's waiver request because he had not attended a personal conference on August 6, 2009, a date that was still in the future at the time the letter was sent. *Id*.

On August 21, 2009, Plaintiff filed a request for a hearing with an ALJ. *Id*. at 43. In a letter dated the same day, the SSA notified Plaintiff that it had determined that he was not without fault for overpayments because he knew or should have known he was receiving

duplicate checks and benefits in the wrong amount; as best the Court can discern, this is the first and only reference to duplicate checks in the extensive record before the Court. *Id*. at 45. On September 16, 2009, the SSA confirmed receipt of Plaintiff's request for a hearing with an ALJ. *Id*. at 47–48.

On March 13, 2010, the SSA informed Plaintiff that his overpayment balance had grown to $107,581.30. Dkt. 15-2 at 81. But then several weeks after that, on May 3, 2010, the SSA notified Plaintiff that the "[b]alance" he "owe[d]" was only $22,774.80. *Id*. at 80. On May 4, 2010, Plaintiff filed yet another request for waiver. *Id*. at 41–48. And in a handwritten letter bearing the same date, Plaintiff explained that he missed a hearing on March 3, 2010, because he did not receive notice of the hearing date. *Id*. at 49–51. In a letter dated June 11, 2010, the SSA notified Plaintiff that a hearing was set in his case for July 22, 2010. *Id*. at 31–34. But then in a letter dated July 23, 2010, the agency explained that Plaintiff's request for a hearing was "dismiss[ed]" because he had not appeared at the hearing scheduled for the previous day. *Id*. at 83–87.

The SSA next informed Plaintiff that he owed the agency $24,659.30 as of August 16, 2010, which the agency would recoup by withholding $25 per month for the next 986 months. *Id*. at 75. On January 18, 2011, the SSA told him that he owed $15,469.00, which covered a period of institutionalization and "include[d his] prior overpayment." Dkt. 15-3 at 13. On May 31, 2011, Plaintiff requested a review of the hearing decision. *Id*. at 5 (arguing that Plaintiff did not owe $40,000 because he never received that money). In a letter dated July 16, 2011, the SSA told Plaintiff that he now owed $88,129.80. Dkt. 15-2 at 88; Dkt. 15-5 at 3.

On July 22, 2011, Plaintiff filed another request for reconsideration, Dkt. 15-2 at 93, which the SSA denied on January 11, 2012, *id*. at 94. In denying the request, the agency

explained that the record showed that Plaintiff had received overpayments of $107,581.30 and that this amount had been reduced through withholdings to $86,855.80. *Id.* The large outstanding balance was, in part, because the payments of $20,349.50 and $25,200, which the ALJ had ordered in 2007 to compensate Plaintiff for underpayments, were now being treated as overpayments. The SSA explained:

> On 02/06/2008 and 03/23/08, you were sent two notices that we made two payments of $20,349.50 and $25,200.00 into your bank account. Both of the payments were not back-pay awards because we found out that you had a warrant that was issued by [the] Wisconsin Department of Community Corrections on 4/28/2005. The warrant was closed on 08/26/2008 when you surrendered yourself. By law, you should not [have] receive[d] Social Security benefits when you [were] in the prison, [were] a fugitive, or have [a] criminal warrant against you. However, we had released the two payments to you before we found out about your warrant.

*Id.* Because Plaintiff was a fugitive for the entire period from April 28, 2005 to August 26, 2008, the SSA concluded that he should not have received payments during that time.

On January 20, 2012, Plaintiff filed both another request for reconsideration, specifically contesting the SSA's conclusion that the two back payments should be treated as overpayments, Dkt. 15-2 at 99, and a request for a hearing, Dkt. 15-3 at 2. In a followup letter, Plaintiff argued that he was in jail on the day the original hearing had been scheduled and was thus unable to attend. *Id.* at 8. The SSA Appeals Council confirmed that Plaintiff was incarcerated at the time of his scheduled hearing, which it found to be a "good reason" for not appearing that merited "another opportunity for a hearing," and, accordingly, the SSA remanded the case to an ALJ for a hearing. *Id.* at 9–11. The new hearing was initially scheduled for July 8, 2013, *id.* at 27, but was rescheduled for November 1, 2013, so that the agency could gather more records, *id.* at 42.

On the appointed date, Plaintiff appeared pro se before Administrative Law Judge David Skidmore. Dkt. 15-5 at 17, 20. The "issue to be determined" at the hearing was "whether there

ha[d] been an incorrect payment of benefits, and if so, for what month(s), and whether adjustment or recovery of the incorrect payment [should] be waived." *Id.* at 17.  The ALJ issued his "partially favorable" decision on February 21, 2014.  *Id.* at 13–20.  The issue for adjudication was captioned as a claim for "Overpayment and Underpayment of Disability Benefits."  *Id.* at 16. ALJ Skidmore noted that Plaintiff "testified that he was owed $40,000 in back payment" and that he "repeatedly claimed he was underpaid $40,000."  *Id.* at 18.  But the ALJ determined that the record did not "show any underpayment due."  *Id.* at 19.  The ALJ found that "the detailed statement of paid versus payable" contained in the January 11, 2012 letter to Plaintiff "indicates clearly that[,] as of" that date, Plaintiff had been "overpaid $86,855.80."  *Id.* at 18–19.

But the decision was partially favorable because, as the ALJ explained, the SSA had decided to adhere to the Second Circuit's decision in *Clark v. Astrue*, 602 F.3d 140 (2010), which required the agency to refrain from assessing overpayments "for periods during which a beneficiary is subject to a probation or parole violation warrants."  Dkt. 15-5 at 19.  Applying this rule, the ALJ concluded that Plaintiff's overpayment balance should be reduced for the periods when he was considered a fugitive felon, but the ALJ did not do the math to determine how much Plaintiff still owed after that adjustment.  *Id.* at 19–20.  Finally, the ALJ determined that Plaintiff was not without fault for the remaining overpayments because he knew or should have known that he was not due the payments he received while working or incarcerated.  *Id.* at 19.  As evidence that Plaintiff was not "mentally incapable" of notifying the SSA "regarding his work or imprisonments," the ALJ noted that the letters Plaintiff had submitted showed "excellent handwriting" and were "well written and clearly convey[ed the] ideas that he [was] not overpaid and [that] an underpayment [was] due [to] him."  *Id.*  The ALJ therefore determined that the overpayments should not be waived.  *Id.* at 20.

Plaintiff appealed ALJ Skidmore's decision to the SSA Appeals Council.  Dkt. 15-4 at 3–4.  In his handwritten appeal, Plaintiff included several references to the $40,000 the he claimed the SSA owed him but that he allegedly never received.  *Id*.  On September 30, 2016, the Appeals Council vacated and remanded the ALJ's 2014 decision.  *Id*. at 7–11.  The Appeals Council directed the ALJ on remand to make specific findings as to "each discrete period of non-entitlement, the basis for the non-entitlement, and the resulting overpayment amount."  *Id*. at 9.  The Appeals Council also acknowledged that the SSA's notices to Plaintiff had provided "significantly different amounts" of overpayment; noted "the complexity of multiple overpayments periods, the history of lump sum payments, and the existence of previously adjudicated overpayments;" and encouraged the ALJ to seek "assistance from the payment center" if necessary.  *Id*. at 9–10.  In addition, the Appeals Council clarified that Plaintiff's overpayments related to employment activity had already been adjudicated and were no longer at issue, *id*. at 11, and it directed the ALJ to determine the specific periods and amounts of *Clark* relief to which Plaintiff was entitled and to make findings as to whether waiver of the overpayments should be granted, *id*. at 9.  Finally, with respect to wavier, the Appeals Council directed the ALJ to rely on relevant evidence (including medical evidence), rather than Plaintiff's good handwriting, to determine Plaintiff's "ability to comprehend and comply with his reporting obligations."  *Id*. at 9.

On remand, Plaintiff again appeared pro se before ALJ Skidmore.  Dkt. 15 at 16.  This time, the ALJ issued a "fully favorable" decision.  *Id*. at 13.  First, the ALJ determined that Plaintiff had been overpaid $85,305.80 and clarified that Plaintiff had been overpaid (1) from April 1997 to August 1998 when he was gainfully employed; (2) from July 2000 to February 2001, when he was incarcerated; (3) from May 2005 to August 2005, February 2006 to

10

September 2006, and January 2007 to April 2008, during which times he was a "fugitive felon;" and (4) from March 2009 to June 2009 and from November 2010 to December 2010, when he was confined to a mental health facility.  *Id*. at 19.  Next, the ALJ considered whether, and to what extent, Plaintiff was entitled to relief based on the *Clark* decision.  Dkt. 15 at 19–20.  He concluded that after October 24, 2006, which is the date on which the *Clark* decision became effective, Plaintiff had been improperly assessed with $26,277.10 in overpayments while he was subject to warrants for violations of probation or parole.  *Id*.  The ALJ deducted that amount from Plaintiff's overpayment total, leaving a remaining balance of $59,028.70.  *Id*. at 22. Finally, the ALJ decided to waive recovery of the remaining overpayments.  *Id*. at 20–22.  He determined that Plaintiff was not at fault for the overpayments because "[e]ven a most cursory review of this particularly voluminous record demands notice that [Plaintiff] has received benefits for almost three decades due to mental impairments which are inconsistent with the ability to comply with the reporting requirements at issue in this appeal."  *Id*. at 20.  And he also determined that recovery would defeat the purposes of the Act because Plaintiff's rent was about to increase, after which his monthly expenses would exceed his monthly income.  *Id*. at 21–22.  ALJ Skidmore, accordingly, determined that Plaintiff was "not liable for [the] remaining balance of . . . $59,028.70."  *Id*. at 22.  Finally, the ALJ concluded that "[b]ecause there [was] no indication" that Plaintiff had not received "all benefits owed to him," and because Plaintiff "was able to repay the overpayment, regardless of fault, through August 2, 2017, no underpayment ha[d] occurred."  *Id*.

Plaintiff again appealed, sending a series of letters and emails to the Appeals Council.  *Id*. at 28.  Plaintiff requested that the SSA pay him the money that the ALJ determined was incorrectly treated as an overpayment, in violation of the *Clark* decision.  *Id*. at 30.  He argued

that the ALJ's decision on remand was "illegal," *id*. at 32, and again argued that the ALJ had incorrectly counted the back pay that Plaintiff received in 2008, which the SSA first treated as compensation for an underpayment and later treated as an overpayment, *id*. at 32, 34 (alleging that "the ALJ took my $48,000 SSA award back pay and cited it was an overpayment.").  He requested that the $50 per month that SSA had previously withheld from his monthly benefit checks be repaid to him by increasing his future checks by $50.  *Id*. at 30–31.  And he repeatedly argued that he should not have to repay $40,000 because he never received it.  *Id*. at 32–33.

On September 25, 2017, the Appeals Council denied Plaintiff's request for review, explaining that the arguments he presented "do not provide a basis for changing the Administrative Law Judge's decision."  *Id*. at 24.  The Appeals Council acknowledged Plaintiff's requests for "immediate refund of all *Clark* relief money [he was] due, an immediate refund of all money collected/recovered with respect to the overpayments, and payment of back pay of $40,000 [he] never received after winning [his] case."  *Id*.  The Appeals Council noted that the ALJ's favorable decision had waived recovery of overpayments while finding no underpayments and that Plaintiff's "case is currently pending at the payment center for effectuation of the favorable hearing decision."  *Id*.  (It was unclear from the Appeals Council's decision, however, what further action from the payment center would be necessary, given that the ALJ had decided that Plaintiff and the SSA did not owe each other any money.)  The Appeals Council further noted that, pursuant to a favorable ALJ decision in 2007, the SSA had "initially withheld $25,200 from [Plaintiff's] retroactive benefits and sent [Plaintiff] a payment of $20,349.50" but later sent "a payment of $25,200, the amount previously withheld from [his] retroactive benefits."  *Id*.  The Appeals Council therefore affirmed the ALJ, which, as the decision explained, "means that the Administrative Law Judge's decision is the final decision of the

Commissioner of Social Security" in Plaintiff's case. *Id*. at 25.  Plaintiff subsequently sent the Appeals Council a request to reopen his case. *Id*. at 11.

On December 18, 2017, Plaintiff filed this lawsuit. Dkt. 1.  He alleges that the SSA's decision should be reversed because: (1) the SSA owes him payment of $26,277.10 in *Clark* money, which he alleges should not be used to offset any debts or other overpayments, *id*. at 4 (Compl. ¶ 6); (2) the SSA did not overpay him by $40,000 because he never received that money, *id*. (Compl. ¶ 11); (3) the SSA did not overpay him by $48,000, because he was owed that money as compensation for a past underpayment, *id*.; and (4) the SSA must pay him back for any repayments he made toward the alleged overpayments, at a rate of $50 per month, *id*. at 5 (Compl. ¶ 14).  Plaintiff also seeks compensatory and punitive damages. *Id*. (Compl. ¶ 13).

In a letter dated January 5, 2018, the Appeals Council responded to Plaintiff's request to reopen his case.  It wrote that Plaintiff is not entitled to $26,277.10 in *Clark* relief because that amount "represents benefits already paid to [Plaintiff] during the periods of erroneous suspension from 2005 to 2008." Dkt. 15 at 11.  The Appeals Council also extended the time for Plaintiff to file a civil action to 60 days from his receipt of the letter. *Id*. at 12.  On July 29, 2018, the SSA sent Plaintiff a letter stating that he had been underpaid $20,840 for the period between March 2018 and June 2018. Dkt. 28 at 9 (Ex. A).  The logic by which the letter arrives at that underpayment figure is difficult to parse.  The letter merely states that the SSA paid Plaintiff "$432,573.90 for March 2018 through June 2018" but "should have paid [him] $453,413.90" for that period, resulting in an underpayment of $20,840. *Id*.

On October 17, 2018, Plaintiff moved for judgment of reversal, relying on the same arguments made in his complaint. Dkt. 27.  Rather than respond to that motion or file a motion for judgment of affirmance, the SSA moved to dismiss, arguing that Plaintiff failed to exhaust

administrative remedies before filing his lawsuit.  Dkt. 28.  Plaintiff filed a response, Dkt. 30,

and the SSA replied, Dkt. 31.

## II.  ANALYSIS

### A.    Motion to Dismiss

The SSA moves to dismiss the complaint for lack of subject-matter jurisdiction.  Dkt. 28

at 1.  It argues that "there is no indication that [Plaintiff] raised the issues identified in his

Complaint or Motion for Judgment of Reversal to the Appeals Council;" that the ALJ's decision

focused on other issues; and that the agency thus "has not had an opportunity to address

Plaintiff's claim that it still owes him money."  *Id*. at 3.  The SSA further notes that Plaintiff filed

his lawsuit while his case "was pending at SSA's payment service center for effectuation of ALJ

Skidmore's favorable decision."  *Id*. at 5.  The SSA then portrays the letter that the agency sent

Plaintiff on July 29, 2018, regarding an underpayment of $20,840, as effectuating ALJ

Skidmore's decision.  *Id*. at 2.  Accordingly, in the agency's view, "Plaintiff has not exhausted

his administrative remedies regarding the amount the [SSA] owes him" and "has not obtained a

judicially reviewable 'final decision after a hearing' on the matter of [the] SSA payments

allegedly owed to him."  *Id*. at 5.

The Social Security Act's mandate that a claimant exhaust administrative remedies

comprises two components, a jurisdictional presentment requirement and a non-jurisdictional

exhaustion requirement.  *See Calderon v. Berryhill*, No. 17-494, 2019 WL 95565 (RDM), at *3

(D.D.C. Jan. 3, 2019) ("*Calderon I*").  The Act provides that "[a]ny individual, after any final

decision of the Commissioner of Social Security made after a hearing . . . may obtain a review of

such decision by a civil action commenced within sixty days after the mailing to him of notice of

such decision or within such further time as the Commissioner of Social Security may allow."

14

42 U.S.C. § 405(g).  Another provision of the Act, moreover, makes clear that Section 405(g)

constitutes the exclusive grant of jurisdiction for courts to review the SSA's decisions.  42

U.S.C. § 405(h) ("No findings of fact or decision of the Commission . . . shall be reviewed by

any person, tribunal, or governmental agency except as herein provided" and "[n]o action against

the United States, the Commissioner of Social Security, or any officer or employee thereof shall

be brought under section 1331 or 1346 of [T]itle 28 to recover on any claim arising under" Title

II of the Social Security Act); *see also Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir.

2018).  Although the statute leaves little doubt that Plaintiff's sole recourse lies in an action

brought pursuant to Section 405(g), the question whether the statutory exhaustion requirement is

jurisdictional has generated substantial litigation.  *See Shands Jacksonville Med. Ctr. v. Azar*,

366 F. Supp.3d 32, 55 (D.D.C. 2018).

Relying on the plain language of the statute, the SSA argues that Section 405(g) "'clearly

limits judicial review to a particular type of agency action'"—namely, a "final decision" at the

end of the SSA's "four-step administrative review process."  Dkt. 28 at 4–5 (quoting *Califano v.

Sanders*, 430 U.S. 99, 108 (1977)).  The SSA is correct that, "[o]n its face[,] [Section] 405(g)

thus bars judicial review of any denial of a claim of disability benefits until after a 'final

decision' by the Secretary after a 'hearing.'"  *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976).

But, as the Supreme Court held in *Mathews*, the "final decision" requirement "consists of two

elements, only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived' by

the Secretary in a particular case."  *Id*.  "The nonwaivable element is the requirement that a claim

for benefits shall have been presented to the Secretary" because, "[a]bsent such a claim[,] there

can be no 'decision' of any type."  *Id*.  In contrast, "[t]he waivable element is the requirement

that the administrative remedies prescribed by the Secretary be exhausted."  *Id*.

Exactly what the *Mathews* Court meant by this has generated disagreement over the past

forty years.  Shortly after the *Mathews* decision, for example, the Supreme Court stressed that

*Mathews* involved a constitutional challenge, and the Court thus read the decision as an

application of the "principle that when constitutional questions are in issue, the availability of

judicial review is presumed," and a statutory scheme should not be construed to foreclose review

"unless Congress's intent to do so is manifested by clear and convincing evidence."  *Califano*,

430 U.S. at 109 (internal quotation marks omitted).  Later, the Supreme Court read *Mathews* to

stand more broadly for the proposition that "[Section] 405(g) consists of a nonwaivable"

presentment requirement "and a waivable requirement that the" claimant fully pursue "the

administrative remedies prescribed by the Secretary."  *Heckler v. Ringer*, 466 U.S. 602, 617

(1984).  The Court read *Mathews* to the same effect more recently in *Shalala v. Illinois Council*

*on Long Term Care, Inc.*, 529 U.S. 1, 15 (2000).

The meaning of "presentment" has also generated some uncertainty.  Harking back to the

original explanation in *Mathews* that "presentment" is required because, "[a]bsent . . . a claim[,]

there can be no 'decision' of any type," 424 U.S. at 328, the D.C. Circuit explained in *National*

*Kidney Patients Association v. Sullivan* that the "presentment" requirement arises from

"[Section] 405(g)'s requirement of 'some decision by the Secretary,'" even if that decision is not

the final word in the administrative process.  958 F.2d 1127, 1131 (D.C. Cir. 1992) (quoting

*Mathews*, 424 U.S. at 328).  As the D.C. Circuit noted, the *Mathews* Court found that the

presentment requirement was satisfied, "for example, on the basis of the claimants' having

presented their claims to the local Social Security office *and on appeal* to the regional office."

*Id*. (emphasis added).  Other decisions, however, do not—at least explicitly—limit the

"presentment" requirement to circumstances in which there has been "some decision by the

Secretary." *See, e.g.*, *Ryan v. Bentsen*, 12 F.3d 245, 247 (D.C. Cir. 1993); *Cost v. Soc. Sec. Admin.*, 770 F. Supp. 2d 45, 48–49 (D.D.C. 2011), *aff'd*, No. 11-5132, 2011 WL 6759544 (D.C. Cir. Dec. 2, 2011); *see also Belmonte v. Colvin*, No. 16-1077-APM, 2016 WL 6584476, at *1 (D.D.C. Nov. 7, 2016); *Suarez v. Colvin*, 140 F. Supp. 3d 94, 99 (D.D.C. 2015); *Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, 77 F. Supp. 3d 103, 109 (D.D.C. 2015).

1.    *Presentment*

Here, as in *Calderon*, the Court need not pick a side in the debate over whether Section 405(g), as construed in *Mathews* and its progeny, imposes a jurisdictional "presentment" or jurisdictional "presentment-plus-initial-decision" requirement.  *See Calderon I*, 2019 WL 95565, at *4; *see also Calderon v. Berryhill*, No. 17-494 (RDM), 2019 WL 4575605, at *3 (D.D.C. Sept. 20, 2019) ("*Calderon II*").  Under either approach, Plaintiff has readily satisfied Section 405(g)'s presentment requirement, and the SSA's motion to dismiss under Rule 12(b)(1) is without merit.  Because Plaintiff is proceeding pro se, the Court must construe his complaint liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and the complaint can be read to allege that the ALJ incorrectly treated the $26,277.10 in *Clark* relief to which Plaintiff was entitled as an offset.  Dkt 1.  It was an error to offset that amount against two alleged overpayments because, according to Plaintiff, (1) he never received $40,000 that the SSA treated as an overpayment, and (2) the $48,000 that he did receive was to correct an underpayment—that is, it was not an overpayment at all.  *Id.*  As a result, according to the complaint, the SSA should have paid Plaintiff the full $26,277.10 of *Clark* relief, without any offset.  *Id.*  That argument may or may not have merit, but there is no doubt that Plaintiff presented it (repeatedly) to the SSA, and the agency's arguments to the contrary strain credulity.

17

To start, there is no doubt that Plaintiff presented the argument that his *Clark* relief should be paid to him rather than used to offset any purported overpayments.  In his appeal of ALJ Skidmore's initial 2014 decision, Plaintiff wrote that he was "also asking for all [his] monies due under award '*Clark v. Astrue*' be awarded to [him] in full—approx. $50,000."  Dkt. 15-5 at 27; *see also id*. at 29 (again asking, in follow-up letter to the Appeals Council, to be paid money due under *Clark*).  Plaintiff again raised this argument when appealing the ALJ's favorable decision in 2017.  Dkt. 15 at 30 (seeking "immediate return of all '*Clark v. Astrue*' relief monies due").  Nor did the SSA ignore these arguments.  In his 2017 decision, for example, ALJ Skidmore decided that Plaintiff's *Clark* relief should be used to reduce his overpayment, rather than to effect a refund to Plaintiff.  *Id.* at 19–20.  Similarly, in declining to disturb the ALJ's decision, the Appeals Council referenced Plaintiff's request for "immediate refund of all *Clark* relief money you are due."  *Id*. at 24.

Plaintiff also raised the arguments on which he predicates his claim that no offset was in order.  He argued repeatedly, almost incessantly, that the SSA's overpayment calculations were too high because he never received the $40,000 payment.  *See, e.g.*, Dkt. 15-2 at 51 (stating in a letter regarding a hearing request that he does not owe $40,000 because it was stolen); *id*. at 62–63 (complaining, on a form acknowledging a hearing date in 2010, that $40,000 went missing from his bank and requesting subpoenas to SSA and the bank); Dkt. 15-3 at 5 (requesting review of a hearing decision in 2011 "[b]ecause $40,000.00 of this overpayment was never received by me . . . [s]o I feel that I am not overpaid this amount"); Dkt. 15-3 at 8 (complaining of never receiving $40,000); *id*. at 59 (including arguments about the missing $40,000 in a 2013 letter to ALJ Skidmore); Dkt. 15-4 at 3 (arguing to the Appeals Council in 2014 that he never received $40,000); Dkt. 15 at 33 (arguing to the Appeals Council in a 2017 email that there was no

overpayment at all in Plaintiff's case because, in part, he never received $40,000).  That Plaintiff

made his argument about never receiving a $40,000 payment to the agency is beyond dispute.

The SSA also addressed this argument in its decisions.  In his 2014 decision, ALJ

Skidmore began the "summary of the evidence" section by noting that, at the hearing, Plaintiff

"testified that he was owed $40,000 in back payment."  Dkt. 15-5 at 18.  But based on the

"detailed statement of paid versus payable" from one of the SSA's prior letters to Plaintiff, the

ALJ concluded that Plaintiff was overpaid $86,855.80 and that no underpayment was due.  *Id*. at

18–19.  In his 2017 decision, ALJ Skidmore did not explicitly mention the $40,000 payment, but

he again found that Plaintiff had not been underpaid.  Dkt. 15 at 22.  And in its September 25,

2017 denial of Plaintiff's request for review, the Appeals Council noted that Plaintiff sought

"payment of back pay of $40,000 [he] never received after winning [his] case" but agreed with

the ALJ that Plaintiff had not been underpaid.  *Id*. at 24.

The same is true with respect to the $48,000 payment, which Plaintiff has consistently

maintained was not an overpayment but, rather, was a payment made to correct a previous

underpayment.  He argues in the complaint that the SSA's calculation that it overpaid him

$85,305.80 was erroneous because it mistakenly included the (approximately) $48,000 that

Plaintiff received in 2008 to correct an underpayment in his case.  Dkt. 1 at 4 (Compl. ¶ 11).  The

SSA actually paid Plaintiff $45,549.50 to correct the underpayment.  Dkt. 15-2 at 71.  Although

Plaintiff's math is fuzzy, he makes clear that his statements about $48,000 refer to these same

2008 payments.  Dkt. 15-3 at 59 (distinguishing in a 2013 filing with ALJ Skidmore between the

$40,000 Plaintiff alleges he never received and the separate "$20,000 + $25,000 = $48,000

payment").

Although Plaintiff did not always mention the $48,000 figure (or the correct amount of $45,549.50), he argued throughout the agency process that the SSA's overpayment calculations incorrectly included the back payments he received in 2008. *See, e.g.*, Dkt. 15-1 at 35 (contending in a 2009 request for waiver that it "appears overpayment partially was my back payment awarded on 11/07 by administrative law judge"); Dkt. 51-2 at 99 (asserting in a 2012 request for reconsideration that the alleged overpayment was actually "back payment from winning [Plaintiff's disability] case"); Dkt 15-3 at 2 (arguing on a 2012 hearing request form that the alleged overpayment is instead a "back payment" that is "legal"); Dkt. 15 at 32 (arguing to the Appeals Council in 2017 that the ALJ's decision was "illegal" because the overpayment amount "is indeed the actual award monies granted" to Plaintiff as "three years back pay"). Despite his imprecision, Plaintiff unambiguously maintained that ALJ Skidmore's overpayment calculation was incorrect because it included the money Plaintiff received in 2008 to correct a previous underpayment.

The SSA necessarily considered this issue in evaluating whether the agency had overpaid Plaintiff and whether that overpayment should be waived. In his 2017 decision, ALJ Skidmore determined that Plaintiff had been overpaid $85,305.80; that "there is no indication the claimant has not received all benefits owed to him;" and that "no underpayment has occurred." Dkt. 15 at 22. In declining to review the ALJ's decision, the Appeals Council included a paragraph discussing the payments of $20,349.50 and $25,200 that Plaintiff received in 2008 but credited the ALJ's determination that, all told, Plainitff had been overpaid $85,305.80. *Id*. at 24.

Finally, albeit less frequently, Plaintiff argued before the SSA that he was entitled to a refund of the money that the SSA had previously withheld from his disability checks. In his appeal of the ALJ's 2017 decision, for example, Plaintiff sought "immediate return of all monies

paid by this writer in back payments as I was not at fault." Dkt. 15 at 29. The ALJ, moreover, found that "there [was] no indication [that] the claimant ha[d] not received all benefits owed to him." *Id*. at 22. In its letter affirming that decision, the Appeals Council noted that Plaintiff sought an "immediate refund of all money collected/recovered with respect to the overpayments" but noted that the ALJ "found that [Plaintiff] [was] not underpaid." *Id.* at 24.

The Court is, accordingly, persuaded that Plaintiff presented the claim that he asserts in this case to the SSA, as required by the Act. The SSA's argument to the contrary cannot be squared with even a cursory review of the extensive administrative record.

2.    *Exhaustion*

The SSA's alternative argument that this action is premature because Plaintiff filed suit when his claim was still "pending at SSA's payment service center for effectuation of ALJ Skidmore's favorable decision," Dkt. 28 at 5, does not challenge whether Plaintiff presented his claim, but rather whether he exhausted all of his administrative remedies, which raises, at most, a non-jurisdictional exhaustion defense. A waivable, non-jurisdictional exhaustion requirement, however, constitutes an affirmative defense, and, thus, in the usual course is not best resolved at the motion to dismiss stage, where the complaint need not—and often does not—offer the detail necessary to decide whether the defense is meritorious. *See Calderon II*, 2019 WL 4575605, at *3–4.

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court clarified that, when exhaustion is non-jurisdictional, plaintiffs "are not required to specially plead or demonstrate exhaustion in their complaints." 549 U.S. at 216. A plaintiff raising a claim under Section 405(g), therefore, need plead and prove only the jurisdictional "presentment" requirement; to the extent the failure to exhaust is just an affirmative defense, the plaintiff is "free to omit" it from his complaint, *Kim*

*v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011); *see also Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (holding that "the defendant bears the burden of pleading and proving" exhaustion when it is an affirmative defense).  To be sure, "even when failure to exhaust is treated as an affirmative defense, it may be invoked in a Rule 12(b)(6) motion if the complaint somehow reveals the exhaustion defense on its face." *Thompson v. DEA*, 492 F.3d 428, 438 (D.C. Cir. 2007).  But that is not the case here.  To the contrary, Plaintiff's complaint includes little reference to the procedural history of his administrative claim.  Dkt. 1.  Beyond that procedural roadblock, even if the Court were to consider the SSA's contention that Plaintiff has yet to fully exhaust his claim because it remains "pending at SSA's payment service center for effectuation of ALJ Skidmore's favorable decision," Dkt. 28 at 5, more would be required for the agency to meet its burden.  For one thing, considerable tension exists between the SSA's contention that Plaintiff never raised a claim for payment of the $26,277.10 of *Clark* relief, without any offset, and its suggestion that the payment service center is still deciding whether to make such a repayment.  And, even more to the point, nothing in either ALJ Skidmore's or the Appeals Council's decision suggests that the SSA had more to decide with respect to the issue Plaintiff now presses.  The SSA may have evidence to the contrary, but it has yet to offer that evidence to the Court, nor could it have properly done so in support of a motion to dismiss based on a non-jurisdictional exhaustion defense.

## B.    Compensatory and Punitive Damages

Plaintiff asserts a claim for compensatory and punitive damages.  Dkt 1 at 5 (Compl. ¶ 13).  Although the SSA did not address this claim in its motion to dismiss, the Court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the

absence of a challenge from any party," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  The Court will therefore consider whether it has jurisdiction over Plaintiff's claim for damages.

Plaintiff invokes the Court's jurisdiction under both 42 U.S.C. § 405 and 28 U.S.C. § 1331, the statute conferring federal question jurisdiction.  Dkt. 1 at 2 (Compl. ¶ 1).  Although Section 405 confers jurisdiction on federal courts to review final actions of the SSA, it simultaneously bars suits premised on 28 U.S.C. § 1331.  *See* 42 U.S.C. § 405(h) ("No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 . . . of title 28 to recover on any claim arising under [Title II of the Act].").  As a result, Plaintiff's assertion of subject-matter jurisdiction rises or falls based on Section 405(g), and, to the extent he seeks damages (as opposed to declaratory or injunctive relief), his argument falls.

The authority granted to the federal courts by Section 405(g) is circumscribed.  The statute declares: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The statute, which is the sole source of the Court's jurisdiction, says nothing about the award of damages.  Moreover, and even beyond that decisive infirmity with Plaintiff's damages claim, he has failed to identify any applicable waiver of sovereign immunity.  It is settled beyond question "that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

Even when the United States does waive its immunity, the Court must still "strictly construe[]" the waiver "in terms of its scope, in favor of the sovereign," and, "[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign

immunity must extend unambiguously to such monetary claims." *Lane v. Peña*, 518 U.S. 187, 192 (1996). Here, nothing in Section 405(g) waives the sovereign immunity of the United States with respect to claims for damages, *see, e.g.*, *De Lao v. Califano*, 560 F.2d 1384, 1391 (9th Cir. 1977); *Robinson v. Sec'y of Health & Human Servs*., No. 89-1199, 1989 WL 109432, at *1 (6th Cir. Sept. 22, 1989); *Nzongola v. Astrue*, 863 F. Supp. 2d 25, 28 (D.D.C. 2012); *Lloyd v. Shalala*, No. 92 Civ. 9454 (JSM), 1993 WL 299291, at *1 (S.D.N.Y. Aug. 4, 1993), and Plaintiff fails to identify any other waiver of sovereign immunity for damage claims relating to the adjudication of social security benefits.

The Court therefore lacks jurisdiction to adjudicate Plaintiff's claim for damages and will, accordingly, dismiss that claim.

## C.    Motion for Judgment of Reversal

This, then, leaves Plaintiff's motion for judgment of reversal. Dkt. 27. In seeking affirmative relief, Plaintiff once again argues (1) that ALJ Skidmore "contradict[ed his] fully favorable decision" and "seize[d] Plaintiff's *Clark v. Astrue* monies," *id*. at 2; (2) that Plaintiff never received an additional lump sum of $40,000, *id*.; (3) that "$48,000 is not an overpayment" because it was Plaintiff's "original award," *id*.; and (4) that the SSA should repay Plaintiff the money it had previously withheld to offset overpayments, *id*. at 3. Complicating the Court's consideration of this motion is the fact that the SSA did not respond to it, at least not on the merits. The SSA's motion for judgment of affirmance was due December 14, 2018. *See* Minute Order (October 5, 2018). But the agency never responded, opting instead to file its motion to dismiss on December 13, 2018. Because the SSA failed to respond to Plaintiff's motion for judgment of reversal, the Court must treat Plaintiff's uncontested evidence, insofar as he presents any, as true for purposes of resolving the pending motion. *See* Fed. R. Civ. P. 56(e)(2); *see also*

*Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016); Local Civ. R. 7(h)(1).

At the same time, the Court must resolve any legal questions posed by Plaintiff's motion without

the benefit of briefing from the SSA.  *See Winston & Strawn, LLP*, 843 F.3d at 507.

As a general rule, the SSA's benefits decisions are entitled to substantial deference.  *See*

*Cunningham v. Heckler*, 764 F.2d 911, 915 (D.C. Cir. 1985) (describing the "narrow" scope of

judicial review in "cases involving disability determinations under the Social Security Act").

The Court must affirm the agency's decision if it is based on "substantial evidence."  *Biestek v.*

*Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that "the threshold for such evidentiary

sufficiency is not high").  Substantial evidence is "'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C.

Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The test requires "more

than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Id.*

(internal quotation marks omitted).  But even though the standard is deferential, the Court "must

carefully scrutinize the entire record."  *Id.*

The substantial evidence standard applies to review of both SSA overpayment and

underpayment decisions.  *McCarthy v. Apfel*, 221 F.3d 1119, 1125 (9th Cir. 2000).  Although the

D.C. Circuit has not ruled on which party bears the burden of establishing the fact and amount of

overpayments, those circuits that have considered the question have held that the burden falls on

the SSA.  *See id.* at 1124; *see also Cannuni ex rel. Cannuni v. Schweiker*, 740 F.2d 260, 263 (3d

Cir. 1984); *United States v. Smith*, 482 F.2d 1120, 1124 (8th Cir. 1973).

Applying these rules to this case presents the Court with something of a Gordian knot.

The Court's review under the substantial evidence standard must be deferential . . . but for

proving overpayments, the burden rests on the agency . . . and the agency did not file a response

25

to Plaintiff's motion for judgment of reversal . . . and the Court must consequently treat Plaintiff's uncontested assertions of fact as true.  Two considerations, however, provide a path forward: first, the only relevant facts before the Court are those contained in the administrative record, and, second, social security cases, like this one, require courts to scrutinize the administrative record to determine whether the agency's decision was based on substantial evidence.  With those considerations in mind, the Court can cut the Gordian knot.

To determine the amount of Plaintiff's outstanding overpayments, the 2017 ALJ decision started by identifying the specific periods during which Plaintiff was overpaid because he was incarcerated, institutionalized, or a fugitive.  Dkt. 15 at 19.  The ALJ then consulted Plaintiff's Master Beneficiary Record, which sets out Plaintiff's periods of suspension and shows a partial recovery balance of $62,505.80 and another partial recovery balance of $22,800.00, for a total overpayment of $85,305.80.  Dkt. 15-6 at 75, 78.  Pursuant to *Clark*, the ALJ reduced Plaintiff's overpayment balance by $26,277.10 for the periods when Plaintiff had been incorrectly deemed ineligible for benefits based on warrants for violation of probation or parole, leaving a remaining total of $59,028.70.  Dkt. 15 at 19–20.  But because Plaintiff was not at fault for the overpayment and because he could not afford to pay the money back, the ALJ waived recovery of the overpayment.  *Id*. at 20–22.  Finally, the ALJ concluded that "[b]ecause there is no indication the claimant has not received all benefits owed to him, and because the claimant was able to repay the overpayment, regardless of fault, through August 2, 2017, no underpayment ha[d] occurred."  *Id*. at 22.  Each step in the ALJ's reasoning finds support in the record.

Plaintiff's arguments, at least without further substantiation, do not cast serious doubts on the soundness of the ALJ's logic.  Plaintiff first argues that the $26,277.10 of *Clark* relief should be paid to him, rather than used to reduce his overpayment.  Dkt. 27 at 1.  He seems to

misapprehend the nature of the ALJ's *Clark* analysis. The ALJ did not find that Plaintiff had

been underpaid $26,277.10. Rather, he determined that Plaintiff had already been paid the

$26,277.10 and that those past payments were not overpayments because Plaintiff remained

eligible for benefits while subject to warrants for probation or parole violations. Dkt. 15 at 19–

20. Following this logic, Plaintiff is not entitled to receive the $26,277.10 payment because he

has already received it; the ALJ simply found that the $26,277.10 was not an *over*payment,

which would have required that Plaintiff *re*pay the amount to the SSA.

Next, Plaintiff argues that the total overpayment amount of $85,305.80 is "false" because

he never received $40,000 and because the payments he received in 2008 totaling $48,000 were

not overpayments but, instead, were issued to correct previous underpayments. Dkt. 27 at 2. As

to the $40,000, there is no evidence in the existing record, aside from Plaintiff's own,

unsupported assertions, that Plaintiff was ever due a $40,000 check or, even if he were due such

a check, that he did not receive it. To the extent Plaintiff claims that the $40,000 was stolen from

his bank account by a third-party, perhaps including "anti-government factions," Dkt. 27 at 3, a

social security appeal is not the proper mechanism for investigating or prosecuting such a crime.

In any event, there is no indication in the record that the ALJ included this $40,000 in his

calculations in reaching the total of $85,305.80.

As to the $48,000 (really $45,549.50), the existing record indicates that Plaintiff received

that money in 2008 as compensation for what the agency believed at the time were past

underpayments, but that the SSA later discovered Plaintiff should not have been paid (some or

all of) that money, because he was actually ineligible for benefits during the relevant time period.

Tracking the $45,549.50 through the administrative process, based on the record before the

Court, is not easy. First, an ALJ in November 2007 determined that Plaintiff had been underpaid

$45,549.50 for three years when the SSA incorrectly deemed him no longer disabled and stopped paying his benefits.  Dkt. 15-2 at 64–67; Dkt. 15-2 at 71.  Once the agency paid Plaintiff the $45,549.50 in 2008, that money stopped being an underpayment and simply became a payment, part of the total benefits that Plaintiff had received.  The SSA later determined, however, that at least some portion of those back payments to Plaintiff was issued in error, because outstanding warrants for his arrest rendered him ineligible for benefits during the period when the SSA had originally determined he was underpaid.  Dkt. 15-2 at 94.  Because the ALJ did not explicitly mention the $45,549.50 figure in explaining his tabulation of Plaintiff's overpayments, the record is unclear with respect to what portion of that money he counted as an overpayment.  The Court's best reading of the ALJ's decision suggests that the ALJ counted at least some of Plaintiff's back pay award of $45,549.50 as part of the overall overpayment, because the ALJ determined that Plaintiff was ineligible for benefits as a fugitive felon during date ranges—from May 2005 to August 2005; February 2006 to September 2006; and January 2007 to April 2008— that coincide with the period of time from 2004 to 2007 originally covered by the back payments.  Dkt. 15 at 19.  But nothing precludes the SSA, either legally or logically, from determining that it had overpaid Plaintiff in the process of compensating him for what it had previously thought was an underpayment.  The ALJ carefully explains exactly when Plaintiff received benefits despite being ineligible for them, and his calculation of Plaintiff's overpayment therefore appears to be supported by substantial evidence.

That said, the letter that Plaintiff received on July 29, 2018 notifying him that he had been underpaid $20,840, Dkt. 28 at 9 (Ex. A), does give the Court some pause in reviewing the ALJ's 2017 finding that Plaintiff had not been underpaid.  Given the size of Plaintiff's monthly checks, it would not be possible for that $20,840 underpayment to have accrued within the year

between the ALJ's decision and the letter from the payment processing center.  Thus, there appears to be some tension between the ALJ's decision and the July 29, 2018 letter.  But because Plaintiff does not raise any argument based on the letter in his motion for judgment of reversal and because it is difficult for the Court to parse the apparent conflict between the documents without further briefing from the parties, the Court cannot conclude on the present record that the ALJ's overpayment calculation is unsupported by substantial evidence.

Finally, Plaintiff argues that, given the ALJ's "favorable" decision, he is entitled to a refund for the withholdings that the SSA had made from his benefits to recover his overpayments.  Dkt. 27 at 3.  It is not entirely clear to which withholdings Plaintiff is referring. If he means the $50 per month that the SSA began withholding from his payments (with his agreement) in 2001 to recover overpayments made during periods when Plaintiff was employed or incarcerated between 1997 and 2001, *see* Dkt. 15 at 58–59, those issues were fully adjudicated in a prior agency proceeding, and that previous decision of the SSA is not before the Court.  If, instead, Plaintiff seeks repayment of benefits that were withheld during a more recent period of suspension, it is at least possible that he might have a claim, but his motion for judgment of reversal is too vague for the Court to determine whether Plaintiff may have been underpaid at some point in the past 20 years.  For these reasons, the Court is unpersuaded that the ALJ's decision, which is the final decision of the SSA in Plaintiff's case, is unsupported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the SSA's motion to dismiss, Dkt. 28, is **DENIED**.  The Court, acting *sua sponte*, **DISMISSES** Plaintiff's claims seeking monetary damages against the

SSA.  Finally, Plaintiff's motion for judgment of reversal, Dkt. 27, is hereby **DENIED** without prejudice.

That does not end this case.  Because the SSA never filed a motion for judgment of affirmance, the Court cannot enter judgment in the agency's favor at this point in the litigation. And, conversely, because Plaintiff is proceeding pro se and because the SSA never responded to his motion for judgment of reversal, the Court will grant him an opportunity to renew his motion. The Court will, accordingly, hold a telephonic scheduling conference on October 15, 2020 at 2 p.m. to address next steps in this proceeding.  The deputy clerk will provide the parties with the telephone number and access code to use for the scheduling conference.

**SO ORDERED**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 16, 2020